## Appeal of GAULEY MOUNTAIN COAL CO.

Docket No. 1463.   Submitted October 9, 1925.   Decided February 9, 1926.

> Where the taxpayer agreed to sell coal to a railway company at 25 cents per ton less than the market price for a period of 10 years, in consideration of the railway company constructing a branch line to its mine and purchasing at least 100,000 tons of coal per year for that period, *held*, that the taxpayer may not include in its invested capital the amount of $250,000, representing the difference between market and selling prices for the 10-year period.

*Francis J. Sweeney, Esq.,* for the taxpayer.
*M. N. Fisher, Esq.,* for the Commissioner.

Before GRAUPNER, TRAMMELL, and PHILLIPS.

This is an appeal from the determination of a deficiency in income and profits taxes for the calendar year 1918 in the amount of $71,393.79, of which $31,483.64 is in controversy. The deficiency arises from the refusal of the Commissioner to permit (1) the inclusion in invested capital of the value of certain rights acquired under a contract between the taxpayer and the Chesapeake & Ohio Railway Co.; and (2) the reduction of invested capital by adjustments to plant equipment. The controversy on the latter point was settled by a stipulation filed.

#### FINDINGS OF FACT.

The taxpayer is a West Virginia corporation, with its principal place of business at Ansted. It was organized about 1889 and is engaged in the operation of coal mines in Fayette County, W. Va.

Prior to the organization of the taxpayer, several attempts had been made by its predecessors in interest to operate the mine here involved, but all such efforts had resulted in failure, due to the lack of transportation facilities for the mined coal.

On October 24, 1889, the Chesapeake & Ohio Railway Co., as party of the first part, and the taxpayer, as party of the second part, entered into an agreement, the material parts of which are as follows:

1. The said party of the second part being the assignee of William N. Page of Fayette County, West Virginia, of a lease taken by the said Page from J. M. Payne, Thomas D. Ranson and George Couch, Commissioners, of certain prop-

104881—27——45 .

erty near Ansted, Fayette County, West Virginia, known as the property of the Hawk's Nest Coal Company, Limited, hereby agrees to supply the said Railway Company with the run of mine coal from the said mines at the rate of sixty cents per ton of 2240 pounds, free on board cars at the mines to the extent of the full capacity of the mines if required by the said Railway Company, except as hereinafter provided.

2. The said party of the first part agrees to guarantee orders and transportation for not less than one hundred thousand tons of the said coal per annum for the period of ten years, provided the said coal shall be suitable for railroad use, which in case of dispute is to be determined by arbitration as hereinafter provided.

3. Nothing in the Agreement shall be held to restrain the said Coal Company from supplying coal to parties other than the Chesapeake & Ohio Railway Company, so long as the quantity thus supplied shall not interfere with the furnishing of one hundred thousand tons per annum to the said Railway Company as above provided.

4. The said Railway Company agrees to begin to construct before the first day of December A. D., 1889, and to complete with all possible diligence, a line of standard gauge railway from the main line of the Chesapeake & Ohio Railway at Hawk's Nest, West Virginia, to the said mines, and to maintain and operate the said road without any charge or freight rate additional to the regular New River charges on coal and coke, and when the said road is completed to supply to the said Coal Company its due proportion of cars for the prompt delivery of its product without delay, except such as may be caused by unavoidable accidents. The said Railway Company also agrees that the rates on coal to any iron or steel works shall at all times be reasonable and equitable as compared with the rates on coal or coke from other points, and that the said party of the second part shall be entitled to and accorded as favorable rates and facilities as may be enjoyed by or accorded to any agency, individual or corporation engaged in the coal business in the New River section of the railroad.

5. It is further agreed that in case the selling price of the New River coals as a section shall fall below and be furnished at less than eighty five cents per gross ton free on board cars, then the said Coal Company is to reduce the price pro rata to the Railway Company; but in no event shall any reduction be made which will bring down the net profit on the said coal to less than twenty cents per ton, and if there be any dispute as to what the net profit is, the question shall be submitted to arbitration in the manner hereinafter provided. And in the event that the selling price of coals from the New River section should exceed one dollar per ton, the said Coal Company shall be paid by the said Railway Company a corresponding pro rata additional allowance upon the rate of sixty cents per ton hereinbefore specified.

6. The said Railway Company agrees to pay for the coal sold to or through it by the said Coal Company in cash on or before the twentieth day of the month succeeding the month in which the deliveries are made.

\*        \*        \*        \*        \*        \*        \*

8. The said party of the first part guarantees in the event of its failure to take or sell the total product of the mine or mines that the said party of the second part may sell or dispose of the same upon the same footing with any agency established or controlled by the said Railway Company or any other individual to whom cars or facilities shall be furnished, and shall be

allowed the same commission per ton towards the expense of selling as is paid to the New York coal agency of this Company, if it shall then have any and so long as it shall continue, in addition to the selling price upon all sales so effected by the Coal Company independently of the Railway Company and its agency.

The price of 60 cents per ton, specified in the above contract, was 25 cents less than the then prevailing market price, and has at all times since been at least 25 cents less than the prevailing market price.

The Chesapeake & Ohio Railway Co. commenced the construction of the branch line, which was about 4 miles in length, in 1889, and completed it in 1890, at a cost of approximately $100,000. The full length of this branch line traverses the property of the taxpayer. The taxpayer has not paid taxes upon this branch line, which has always been managed, maintained, and operated by the Railway Company.

During the 10-year period in which the agreement between the two companies was effective, the taxpayer supplied the Railway Company with at least 100,000 tons of coal each year, at 25 cents per ton under the prevailing market price.

The Commissioner, in adjusting the taxpayer's plant and equipment account, erroneously reduced the invested capital for the year 1918 by the sum of $234,381.33.

#### DECISION.

The deficiency should be computed in accordance with the following opinion. Final determination will be settled on 10 days' notice, under Rule 50.

#### OPINION.

GRAUPNER: The petition in this appeal contains two allegations of error, one of which was disposed of by stipulation, in accordance with which the taxpayer's invested capital should be increased in the amount of $234,381.33, as set forth in the findings of fact.

The basis of the other alleged error is the contention of the taxpayer that it should be permitted to include in invested capital the amount of $250,000, representing the difference between the market price of coal and the price at which it supplied coal to the Chesapeake & Ohio Railway Co. during the 10 years following the year 1889.

Section 326 of the Revenue Act of 1918 provides for the inclusion in invested capital of (1) cash paid in for stock; (2) tangible property paid in for stock; (3) paid-in or earned surplus and undivided profits; and (4) intangible property paid in for stock.

These provisions are surrounded by circumstances with which we are not immediately concerned. Our problem is to determine under which of the above provisions, if any, the taxpayer is entitled to have the amount of $250,000 included in its invested capital. Clearly, it can not be included as cash paid in, as there was no cash involved in the transaction.

Can it be included under the second provision, which relates to tangible property paid in for stock or shares? We think not. The contractual rights which afforded the taxpayer the means for marketing its coal can, at best, only be considered as an intangible right. Even though these rights operated to the advantage of the taxpayer, they do not come within the provisions of section 326 (a) (4) of the 1918 Act, because they were not paid in for stock or shares.

The principal contention of the taxpayer as to this item is that it should be included in invested capital as earned surplus, on the theory that the sacrifice made in the reduction in price at which it delivered coal to the Railway Company represents a value to be capitalized. The actual result of the contract was that the taxpayer obtained a customer, which, in consideration of the low price which it obtained, constructed a road to receive delivery of coal at the mine. The taxpayer thus gained a certain purchaser for its product and a means of shipping surplus coal mined. What it obtained was really a service and not a capital asset. If any gain accrued to the taxpayer from the construction of the railroad, it was reflected in an increase in the value of its property, and this can not be included in invested capital. *LaBelle Iron Works* v. *United States*, 256 U. S. 377.

From the evidence in this appeal, we can not find that the taxpayer embarked anything in the construction of the railroad or risked any of its capital in the enterprise, and we accordingly approve the action of the Commissioner in excluding the claimed amount of $250,000 from the invested capital of the taxpayer.

TRAMMELL, dissenting: The 25 cents per ton under the market price for coal which the taxpayer gave up to the Railway Company, in consideration for the railroad facilities and rights, was in substance the payment for those facilities and rights. Instead of receiving that money, it allowed the railroad to retain it and received the intangible asset in lieu thereof. This, in my opinion, is the acquisition of the intangible asset, that is, the rights in the railroad facilities, for the consideration paid out of earnings. That part of the earnings used in acquiring that asset should be included in earned surplus.